McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100
Attorneys for Defendants, H.W. Heritage Inn of Mt. Laurel, Inc., Hilton Hotel Corporation and The Blackstone Group, L.P. a/k/a Blackstone Private Equity

By: Edward J. DePascale

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| R.M.W., a minor, by his Guardian Ad Litem, STEVEN F. WOLFE; AMY E. WOLFE; STEVEN F. WOLFE, Individually,<br><br>        Plaintiffs,<br><br>vs.<br><br>HOMEWOOD SUITES BY HILTON MT. LAUREL, HILTON HOTEL CORPORATION, *et al.*,<br><br>        Defendants. | **Civil Action**<br><br>**Case No: 1:09-cv-00400(JHR)(AMD)**<br><br>Civil Action |

**BRIEF OF DEFENDANTS H.W. HERITAGE INN OF MT. LAUREL, INC., HILTON HOTEL CORPORATION AND THE BLACKSTONE GROUP, L.P. A/K/A BLACKSTONE PRIVATE EQUITY IN SUPPORT OF THEIR MOTION FOR AN ORDER GRANTING PARTIAL SUMMARY JUDGMENT (THEREBY DISMISSING THE CLAIMS OF AMY E. WOLFE AND STEVEN F. WOLFE IN THEIR ENTIRETY)**

EDWARD J. DEPASCALE
   *Of Counsel*

LOUIS A. UCCELLO
   *On the Brief*

## PRELIMINARY STATEMENT

This matter arises from plaintiffs R.M.F., Steven F. Wolfe, and Amy E. Wolfe's claims related to an incident that is alleged to have taken place on January 3, 2009, at defendants' hotel establishment – the Homewood Suites by Hilton in Mount Laurel, New Jersey (the "hotel"). Plaintiffs allege that while the Wolfe family members were guests in Room 142 of the hotel, R.M.F. (then age twenty-two months) found a condom. Specifically, plaintiffs alleged that R.M.F. "choked on a used condom (and ingested the contents therein/thereon) which had been overlooked by housekeeping." According to plaintiffs, as a result of the incident, R.M.F. had to undergo medical testing to ascertain whether he contracted "HIV, AIDS and/or any other life threatening, potentially fatal sexually transmitted diseases." Fortunately, R.M.W. did not contract any such diseases.

The claims asserted by plaintiffs relate to R.M.W.'s alleged injuries; his mother, Mrs. Wolfe's, claim pursuant to Portee v. Jaffe, 84 N.J. 88 (1980); and his father, Mr. Wolfe's, *per quod* claim, which bootstraps his wife's claim.

At the time of the incident, Mr. Wolfe was not inside of Room 142; rather, he was at McDonald's purchasing breakfast for his family. Mrs. Wolfe alleges that she left R.M.W. unattended on a pullout sofa bed, for less than forty seconds, at which time she heard him "gag." She returned to the living room area where she had left R.M.W. and retrieved a condom from his mouth. Mrs. Wolfe did not need to perform the Heimlich maneuver or any CPR efforts. After the incident, Mrs. Wolfe disposed of the condom in the trash bin under the kitchen sink. She notified the hotel staff of the incident and then called Mr. Wolfe, who was on a drive-thru line waiting for his breakfast order. So uneventful was the incident that Mr. Wolfe remained at the drive through until his order was complete. He returned to the hotel and fed his three children,

1

including R.M.W., breakfast, while Mrs. Wolfe discussed the incident with hotel staff. At no point in time was 9-1-1 called. R.M.W. was not taken to an emergency room; rather, he first sought medical attention two weeks after the incident.

New Jersey Courts recognize bystander liability claims, in which a plaintiff observes a close family member being injured in a horrific accident caused by defendants' negligence, Portee v. Jaffe, 84 N.J. 88 (1980). However, under the facts of this case, is clear that Mrs. Wolfe cannot establish that defendants' negligence caused the death of or serious physical injury to another; and that she had a sensory and contemporaneous observation of the death or injury at the scene of the accident, as required by Portee. Since Mr. Wolfe's *per quod* claim merely bootstraps Mrs. Wolfe's flawed claim, both of their claims must be dismissed as a matter of law.

## STATEMENT OF UNDISPURTED MATERIAL FACTS

1. This matter arises from plaintiffs R.M.F., Steven F. Wolfe, and Amy E. Wolfe's claims related to an incident that is alleged to have taken place on January 3, 2009, at defendants' hotel establishment – the Homewood Suites by Hilton in Mount Laurel, New Jersey (the "hotel"). Certification of Edward J. DePascale, Esq., dated April 15, 2010 ("DePascale Cert."), Ex. A (p.4, ¶ 1 and p. 5 ¶ 2-6).

2. Plaintiffs allege that while the Wolfe family members were guests in Room 142 of the hotel, R.M.F. (then age twenty-two months) found a condom that was "overlooked" by the hotel's housekeeping staff. DePascale Cert., Ex. A (p.5, ¶ 5).

3. Plaintiffs further alleged that R.M.F. "had been chewing on (and was choking on) [the] used condom." DePascale Cert., Ex. A (p.5, ¶ 5). 0

4. According to plaintiffs, as a result of the incident, R.M.W. had to undergo medical testing to ascertain whether he contracted "HIV, AIDS and/or any other life threatening, potentially fatal sexually transmitted diseases." DePascale Cert., Ex. B (Answer No. 3).

5. On the evening of January 2, 2009, the Wolfe family checked into defendants' hotel. At the time, the family was traveling by car from Florida to their home in Massachusetts. DePascale Cert., Ex. A (p. 4, ¶ 1); Ex. C (17:19-18:25).

6. When the Wolfe family arrived at their room – Room 142 – it appeared clean. They did not observe anything out-of-the-ordinary about their room. DePascale Cert., Ex. C (26:17-27:2).

7. Mr. and Mrs. Wolfe inspected the room to make sure it was safe for their three children. Mrs. Wolfe "looked everywhere" for hidden dangers. She also moved some items

(including a planter and pots) that she thought were unsafe. DePascale Cert., Ex. C (33:23-35:3); Ex. D. (15:5-15).

8. When the Wolfe family arrived at Room 142, the pull-out sofa bed was closed. Mrs. Wolfe removed the cushions, opened the bed, and made the bed using clean bedding (two sheets and a blanket) that were stored in the closet. DePascale Cert., Ex. C (29:4-31:9).

9. Room 142 only had one bed, which Mr. and Mrs. Wolfe slept on that night. R.M.W. slept in a Pack-n-Play playpen. His siblings slept on the pull-out sofa bed located in the living room area of Room 142. DePascale Cert., Ex. C (28:4-29:3 and 35:23-36:3).

10. The following morning, at approximately 8:45 a.m., Mr. Wolfe left the hotel room to purchase breakfast for his family. He went to Dunkin Donuts and then to McDonald's. DePascale Cert., Ex. C (36:12-23).

11. At approximately 9:00 a.m., Mrs. Wolfe left R.M.W. on the pull-out sofa bed watching cartoons. His sister was in the living room area playing a portable videogame system. Mrs. Wolfe went into the bathroom (located through the bedroom area) to assist R.M.W.'s brother. DePascale Cert., Ex. C (36:24-37:6 and 40:15-17).

12. Prior to leaving R.M.W. unattended on the morning of the incident, Mrs. Wolfe knew that R.M.W. had a tendency to put things that he would find into his mouth. DePascale Cert., Ex. C (61:15-18).

13. Within forty seconds of leaving R.M.W. unattended, Mrs. Wolfe heard a single "gag" from R.M.W. At that point in time, R.M.W.'s sister screamed "[R.M.W.]'s blue, [R.M.W.]'s got something in his mouth." DePascale Cert., Ex. C (37:7-14 and 40:3-7).

14. Mrs. Wolfe came into the living room area and noticed that R.M.W. "was blue." He was still seated in the same place where she had left him on the sofa bed. She placed her

4

fingers in R.M.W.'s mouth and retrieved a condom. DePascale Cert., Ex. C (37:14-22, 43:6-9 and 46:19-23).

15. Mrs. Wolfe did <u>not</u> perform the Heimlich maneuver on R.M.W. DePascale Cert., Ex. C (46:24-47:3).

16. Mrs. Wolfe did <u>not</u> perform mouth-to-mouth resuscitation on R.M.W. DePascale Cert., Ex. C (47:17-21).

17. Mrs. Wolfe did <u>not</u> perform Cardiopulmonary Resuscitation (CPR) on R.M.W. DePascale Cert., Ex. C (47:17-21).

18. Upon pulling the condom from R.M.W.'s mouth, air was passing to his lungs and he was pink in color. DePascale Cert., Ex. C (47:17-21).

19. Mrs. Wolfe immediately threw the condom into a trash bin located under the sink in the kitchen area of the hotel room. DePascale Cert., Ex. C (57:25-58:4).

20. Mrs. Wolfe used her cellular telephone to call the hotel's front desk. She explained what had happened and requested assistance. DePascale Cert., Ex. C (49:9-19).

21. Then, Mrs. Wolfe called Mr. Wolfe on his cellular telephone and explained to him what had happened. At the time of Mrs. Wolfe's call, Mr. Wolfe was in line at a McDonald's drive-thru. DePascale Cert., Ex. C (49:23-50:8); Ex. D (19:1-10).

22. So uneventful was the incident that Mr. Wolfe waited "less than five minutes" for his order to be complete before leaving McDonald's and heading back to the hotel to assist his family. DePascale Cert., Ex. D (19:1-18).

23. When Mr. Wolfe returned to the hotel, he fed children their breakfast. At the time, R.M.W. was acting like he would on any other morning. DePascale Cert., Ex. D (23:10-25).

24. The Wolfe family did not call 9-1-1 for emergency assistance. DePascale Cert., Ex. C (50:9-10).

25. R.M.W. was first evaluated by a doctor (his pediatrician) two weeks after the incident. DePascale Cert., Ex. C (73:10-14).

26. R.M.W. underwent one mouth swab test at his pediatrician's office. The results were negative. DePascale Cert., Ex. C (77:5-11 and 78:7-9); Ex. D.

27. In fact, medical records from R.M.W.'s pediatrician's office indicate that "all tests were negative." The records further provide that the pediatrician's office gave Mrs. Wolfe repeated "reassurance" that R.M.W. had not contracted any infectious diseases. DePascale Cert., Ex. D

28. After being evaluated by his pediatrician, R.M.W. was seen "three or four times" by an infectious disease specialist, during which visits blood tests were performed. The infectious diseases specialist's records indicate that R.M.W. was "asymptomatic." DePascale Cert., Ex. C (79:1-80:6); Ex. E.

29. Each and every test R.M.W. has undergone has come back negative. Indeed, R.M.W. did not contract any infectious diseases as a result of the incident. DePascale Cert., Ex. B (Answer No. 3); Ex. C (80:7-15); Ex. D; Ex. E.

30. R.M.W.'s last infectious diseases appointment was in July 2009. He does not require any additional infectious diseases monitoring and, therefore, does not have any pending appointments scheduled. DePascale Cert., Ex. C (82:3-10).

31. Aside from R.M.W.'s claims, Mrs. Wolfe is pursuing a claim pursuant to Portee v. Jaffe, 84 N.J. 88 (1980). Mr. Wolfe is pursuing a *per quod* claim based upon Mrs. Wolfe's Portee claim. DePascale Cert., Ex. F (32:25-33:11).

6

## LEGAL ARGUMENT

## POINT I

### A. The Summary Judgment Standard

Summary Judgment is appropriate in those instances where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the non-moving party receives the benefit of all reasonable doubts and any inferences drawn from the underlying facts Matsushita Elec. Indus. Co. v. Zenith Radion Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

"Summary judgment is not a disfavored procedural shortcut, but rather an essential thread in the fabric of the federal rules that eliminates unfounded claims without recourse to a costly and lengthy trial." Illingworth v. Nestle U.S.A., 926 F. Supp. 482, 487 (D.N.J. 1996). The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). A triable issue is created only where there is sufficient evidence in the record supporting a jury verdict in the nonmoving party's favor. Id. at 249-50.

### B. Mrs. Wolfe Cannot Sustain Her Portee Claim Because The Subject Incident Did Not Result In Either "Death Or Serious Injury."

R.M.W.'s mother, Mrs. Wolfe, is pursuing a bystander liability claim under Portee v. Jaffe, 84 N.J. 88 (1980). Mr. Wolfe is pursuing a *per quod* claim based solely upon his wife's Portee claim. These claims cannot be maintained as a matter of law because Mrs. Wolfe cannot establish the fundamental elements of her individual cause of action.

New Jersey first recognized a claim for so-called "bystander liability" in Portee v. Jaffe, 84 N.J. 88 (1980). There, the Court held that the mother of a seven-year-old boy who observed her son trapped between an elevator door and the elevator shaft could maintain a claim for negligent infliction of emotional distress, although she herself was not physically injured. The mother was able to assert the claim even though she was never in any physical danger. The Portee claim was based entirely on what the mother had observed.

Previously, New Jersey courts had recognized claims for infliction of emotional distress only in cases where the plaintiff was in the "zone of risk." See Falzone v. Busch, 45 N.J. 559 (1965). In other words, the alleged emotional distress had to have arisen from the plaintiff having been placed in "reasonable fear of immediate personal injury." Id. at 569. In addition, the emotional distress had to result in physical manifestations of substantial bodily injury or sickness. See e.g., Caputzal v. Lindsay Co., 48 N.J. 69 (1966) (heart attack caused by shock and fright of seeing discolored water coming from faucet after drinking coffee made from tap water).

Today, New Jersey courts recognize two types of bystander claims: Falzone-based claims, where plaintiff was in the "zone of risk;" and Portee-based claims, in which a plaintiff observes a close family member being injured in a horrific accident caused by defendants' negligence. Here, it is clear that Mrs. Wolfe's claim does not fall within the Falzone analysis because she was never personally within any "zone of risk." Instead, she observed an unfortunate incident involving her son, R.M.W.

In order to sustain her Portee claim, Mrs. Wolfe must establish that: (1) defendants' negligence caused the death of or serious physical injury to another; (2) the plaintiff shared a marital or intimate familial relationship with the injured person; (3) the plaintiff had a sensory

8

and contemporaneous observation of the death or injury at the scene of the accident; and (4) the plaintiff suffered severe emotional distress as a result. See Portee, supra, 84 N.J at 101.

The Portee Court was mindful of the necessary limitations to bystander claims. Id. at 98. The requirement of "death or serious injury," as well as physical proximity to the injured person and "sensory and contemporaneous observance," define the limitation on liability. Ibid. The Supreme Court in Portee clearly expressed its intent to limit claims of negligent infliction of emotional distress to only those involving "death or serious injury". The Court was concerned with the "severity" of injury that forms the basis of the claims. Accordingly, the Court stated:

> The harm we have determined to be worthy of judicial redress is the trauma accompanying the observance of the death or serious injury of a loved one. … We hold that the observation of either death or this type of serious injury is necessary to permit recovery. Since the sense of loss attendant to death or serious injury is typically not present following lesser accidental harm, perception of less serious harm would not ordinarily result in severe emotional distress. Thus, <u>the risk of an extraordinary reaction to less serious injury is not sufficient to result in liability</u>. To impose liability for <u>any</u> emotional consequence of negligent conduct would be unreasonable; it would also be unnecessary to protect a plaintiff's basic emotional stability. Therefore, a cause of action for emotional distress would require the perception of death or serious physical injury. [Emphasis added].

[See Portee, supra, 84 N.J. at 100-101].

Mrs. Wolfe can neither establish that defendant caused the death of or serious physical injury to R.M.W. nor that she had a sensory and contemporaneous observation of the death or injury at the scene of the accident.

Fundamentally, Portee claims are based on "the trauma of seeing a loved one suffer or die." Wolfe v. State Farm Ins. Co., 224 N.J. Super. 348, 352 (App. Div.), 111 N.J. 654 (1988). Hence, only the most severe types of physical injuries will qualify. The serious injury referred to in Portee was watching a child being crushed to death by an elevator. Other types of "serious

9

injury" recognized as worthy of judicial redress are similarly severe, often resulting in death. See e.g., Ortiz v. John D. Pittenger Builder, Inc., 382 N.J. Super. 552 (Law Div. 2004) (child burned to death in house explosion and resulting fire); Mansour v. Leviton Mftg. Co., Inc., 382 N.J. Super. 594 (App. Div. 2006) (child burned by hot liquid from wok that fell onto her); Eyrich for Eyrich v. Dam, 193 N.J. Super. 244 (App. Div. 1984) certif. denied, 97 N.J. 583 (1984) (five-year-old boy fatally mauled to death by leopard at circus held on school grounds).

As disturbing as the condom incident may have been for Mrs. Wolfe, there is absolutely no evidence of "death or serious injury" to R.M.W. The incident did not result in, for example, any life-threatening or disabling injuries to R.M.W. In fact, there was no physical injury sustained by R.M.W. Furthermore, he did not contract any infectious diseases as a result of the incident. Thus, R.M.W. did not sustain a serious injury or death, which is a requirement for Mrs. Wolfe to sustain her claim. Accordingly, even if this court accepts plaintiffs' version of events as true, the resulting injury does not rise to the level required under Portee to sustain a claim of emotional distress.

The Portee test further requires that Mrs. Wolfe be a witness "at the scene of the accident causing death or serious injury" in order to recover for emotional distress. See Portee, supra, 84 N.J. at 99. As the Portee Court explained, "[i]n any given case, as physical proximity between plaintiff and the scene of the accident becomes closer, the foreseeable likelihood that plaintiff will suffer emotional distress from apprehending the physical harm of another increases." Id., at 98. In other words, the plaintiff must have contemporaneously observed or perceived the actual event causing death or serious injury while present "at the scene." "In a bystander case, a plaintiff's theory of recovery is predicated on his or her status as a witness to a horrific event." Lascurain v. City of Newark, 349 N.J. Super. 251, 278 (App. Div. 2002). Those cases

recognizing bystander claims have involved instances where the plaintiff was present at the same time and place with a family member when the injury or death occurred. See e.g., Eyrich for Eyrich v. Dam, 193 N.J. Super. 244 (App. Div. 1984) certif. denied, 97 N.J. 583 (1984) (plaintiff was at the scene, attempted to rescue boy from fatal leopard attack, and observed victim bleeding profusely from the head and neck); see also Dunphy v. Gregor, 136 N.J. 99, 107 (1994) (wife standing five feet away from husband observed vehicle fatally strike him). Recently, in Jablonowska v. Suther, 194 N.J. 91 (2008) the Supreme Court reaffirmed the requirement of "sensory, contemporaneous perception" as a necessary component of a Portee-based claim.

Here, since R.M.W. did not sustain any serious injury or death, Mrs. Wolfe, of course, cannot establish that she was a witness "at the scene of the accident causing death or serious injury," which is required in order for her to recover for emotional distress. See Portee, supra, 84 N.J. at 99.

By contrast, the plaintiff in Portee was a mother who had actually witnessed her son as he was "wedged" between the elevator door and shaft wall, and who later died from his injuries. The Court noted that "the plaintiff watched as her son moaned, cried out and flailed his arms… He died while still trapped, his mother a helpless observer." Portee, supra, 84 N.J. at 91. In fact, the mother was in such close proximity to the incident that she had to be restrained from touching her son so as not to interfere with the rescue attempts. Ibid.

It is evident that the Portee Court explicitly intended to permit bystander claims only where the plaintiff observes "death or serious injury." Albeit a disturbing allegation, R.M.W.'s incident in no way gives rise to a Portee claim. Mrs. Wolfe retrieved a condom from R.M.W.'s mouth and threw it in the trash. She did not perform the Heimlich maneuver, mouth-to-mouth, or any type of CPR. The incident was so uneventful that Mr. Wolfe waited for his breakfast

order at the McDonald's drive-thru before returning to the hotel and feeding his children their breakfast. The Wolfe family did not call for emergency medical assistance. R.M.W. was not taken to an emergency room; rather the Wolfe family drove home from the hotel and first sought medical attention two weeks after the incident. R.M.W. did not contract any diseases from the incident; he was uninjured.

Based on the foregoing, recognition of Mrs. Wolfe's ungrounded Portee claim here would contradict the Court's well-settled intention to limit bystander liability claims to those incidents involving horrific events that result in "death or serious injury." Accordingly, defendants are entitled to summary judgment thereby dismissing each and every claim asserted by Mrs. Wolfe, individually.

### B.     Mr. Wolfe Cannot Sustain his *Per Quod* Claim

Mr. Wolfe's sole claim is a *per quod* claim, which bootstraps Mrs. Wolfe's ungrounded Portee claim. Mr. Wolfe's claim against defendants is, therefore, deficient as a matter of law (for the reasons set forth in Section B) and, as such, should be dismissed by this Court.

## CONCLUSION

For all of the foregoing reasons, defendants H.W. Heritage Inn of Mt. Laurel, Inc., Hilton Hotel Corporation and The Blackstone Group, L.P. a/k/a Blackstone Private Equity respectfully request that this Court enter an Order granting them partial summary judgment thereby dismissing each and every claim asserted against them by Mrs. Wolfe, individually, and Mr. Wolfe, individually.

Respectfully submitted,

**McElroy, Deutsch, Mulvaney & Carpenter, LLP**

Dated: April 15, 2010         By: _____
                              Edward J. DePascale