# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| R.M.W., a minor, by his Guardian *Ad Litem*, STEVEN F. WOLFE; AMY E. WOLFE; STEVEN F. WOLFE; Individually; A.E.W. and A.S.W., minors, by their Guardian *Ad Litem*, STEVEN F. WOLFE<br><br>Plaintiffs,<br><br>v.<br><br>HOMEWOOD SUITES BY HILTON® MT. LAUREL; HILTON HOTEL CORPORATION; THE BLACKSTONE GROUP, L.P. (a/k/a BLACKSTONE PRIVATE EQUITY); H.W. HERITAGE INN OF MT. LAUREL, INC.; ABC FRANCHISEE (1-10), Fictitious Defendant; DEF CORPORATION (11-20), Fictitious Defendant; JOHN/JANE DOE (21-30) (Fictitious Defendant).<br>Defendants. | **Civil Action**<br><br>**Case No.: 09-400 (JHR)** |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

(Document Electronically Filed)

**Motion Returnable: May 17, 2010**

**HOBBIE, CORRIGAN, BERTUCIO & TASHJY**
**A Professional Corporation**
125 Wyckoff Road
Eatontown, New Jersey 07724
(732) 380-1515
Attorneys for Plaintiffs

## PRELIMINARY STATEMENT

In the present matter, Mrs. Wolfe witnessed the near fatal choking of her 22-month old son (the injury). Mrs. Wolfe then immediately came to the realization that the near fatal choking of her 22-month old son was initiated by the fact that he had ingested a used condom and all of the bodily fluids and bloodborne pathogens that were contained therein/thereon. Clearly, this is not the type of shocking event that occurs in the daily lives of most people. The anguish suffered by Mrs. Wolfe with respect to her son is twofold. First, she experienced (contemporaneous to the incident) the initial shock, anguish and fright when she heard her son gag, and observed her son to be unresponsive, not breathing and blue and color. She then frantically took emergent action to free his airway so that he could begin to again move air through his lungs (and begin breathing) only to discover, with shock, horror and fright (also contemporaneous to the incident) that her baby son had ingested a stranger's bodily fluids and bloodborne pathogens through his ingestion of a used condom, which could, separate and aside from the near fatal choking, cause her baby serious personal injury or death. It is respectfully submitted that the common law of this state has evolved to a point where this Court must recognize a valid cause of action for the emotional distress suffered by Mrs. Wolfe under the facts of this case, where her contemporaneous observation of the near fatal choking and the ingestion of bodily fluids and bloodborne pathogens, satisfy the serious injury prong contemplated by the Supreme Court in Portee.

In light of the foregoing, and for all the reasons set forth herein, it is respectfully submitted that Defendants' Motion for Partial Summary Judgment dismissing the Portee claim of Amy Wolfe and the *per quod* claim of Steven Wolfe must be denied.

## PLAINTIFFS' RESPONDING STATEMENT OF UNDISPUTED MATERIAL
## FACTS PURSUANT TO L. CIV. R. 56.1

1.     Mr. and Mrs. Wolfe checked in to Room 142 of the Homewood Suites by Hilton with their three children R.M.W. (then 22 months); A.S.W. (then age 4) and A.E.W. (then age 8) on January 2, 2009 at approximately 9:45 p.m.). (See Deposition Transcript of Amy E. Wolfe, page 9, lines 12-24; page 21, 6-17, annexed as Exhibit "A" to the Certification of J. DeCarlo.)

2.     At the time, the Wolfe family was traveling by car back to their home in Massachusetts after vacationing in Florida. (See Deposition Transcript of Amy E. Wolfe, page 17, line 19 – page 18, line 25; annexed as Exhibit "A" to the Certification of J. DeCarlo.)

3.     Room 142 had a pullout sofa bed in the living room. (See Deposition Transcript of Amy E. Wolfe, page 24, lines 15-22, annexed as Exhibit "A" to the Certification of J. DeCarlo.)

4.     Mrs. Wolfe made up the pullout sofa for her two oldest children to sleep on utilizing two sheets and a blanket that was supplied by the hotel in a zipped plastic bag. (See Deposition Transcript of Amy E. Wolfe, page 29, line 18 – page 30, lines 1-6, annexed as Exhibit "A" to the Certification of J. DeCarlo.)

5.     The next morning, on January 3, 2009, Mr. Wolfe left the room at approximately 8:45 a.m. to get breakfast for his family. (See Deposition Transcript of Amy E. Wolfe, page 36, lines 12-23, annexed as Exhibit "A" to the Certification of J. DeCarlo.)

6.     While he was seated on the pullout sofa bed with his older sister watching cartoons R.M.W. found a used condom within the cushions of the sofa bed which had

2

been overlooked by the hotel's housekeeping staff prior to the Wolfe's checking into the

room on January 2, 2009.

> Q.  Do you know where R.M.W. found the condom?
> A.  I can assume where he found the condom.
> Q.  Do you positively know where he found the condom?
> A.  He didn't move from his spot.
> Q.  When you were in the bathroom were you watching him the entire time he was on the couch?
> A.  I was in the bathroom helping A.S.W.
> Q.  I understand.
> A.  There were no doors shut.  There were no doors shut.  I didn't turn my back but for more than 40 seconds.
> Q.  Did you actually see him find the condom?
> A.  No.
> Q.  The first time you knew of a condom in the room is when you retrieved it from his mouth, correct?
> A.  Yes.
> Q.  Where do you assume that R.M.W. found it?
> A.  Between the cushions of the pull-out sofa.  That's the only other place that it could have been.  He didn't move from where he was.  He couldn't move.  He was like a roly-poly at that stage.  He could walk but the chance of him getting off the couch and running around the hotel room in 40 seconds and then getting back onto the couch are zero.

(See Deposition Transcript of Amy E. Wolfe, page 54, line 4- page 55, line 7 annexed as

Exhibit "A" to the Certification of J. DeCarlo.)

7.      While Mrs. Wolfe was assisting R.M.W.'s brother in the bathroom (who had

diarrhea), R.M.W. placed the used condom in his mouth and began to choke on it.

> I had changed R.M.W.'s diaper and put R.M.W. on the pull-out sofa with A.E.W.  There were cartoons.  A.S.W. needed my help in the bathroom because he had eaten nothing but grease up the 95, so he was having diarrhea.  And he was four at the time so he got kind of scared.  So I was trying to calm A.S.W. down, helping him in the bathroom with the diarrhea, when I heard the gag from R.M.W and immediately spun around, started, you know, it's literally 6 to 8 steps from the toilet to where he was.  It seems like a lot longer than that.  A.E.W. was screaming, "R.M.W.'s blue, R.M.W.'s got something in his mouth."  I had to fight with R.M.W to get whatever it was—I didn't know what it was at the time, obviously, you can't see that.  And he was blue and it was hard to

get my hand down his throat.  He was 22 months old so I think that their instinct is to bite down hard.  I had to have my fingers, two fingers I was able to get in and my index finger caught the lip of something, but whatever it was he was already inhaling it.  It was a very fast-paced situation.  And when I was able to finally get it out, because it wasn't easy, my other children were sitting there screaming because I think A.S.W. didn't understand that R.M.W was choking because all he saw was that his mother was fighting with his baby brother to get something out of his mouth.  And A.E.W. saw the whole thing, start to finish.  So she didn't know what to do.  She was kind of jumping around and my daughter has heart problems so we were really nervous.  I was, you know, really nervous about that.  But we just sat there after everything had happened and didn't know what to do.  Call who?  I have no idea.

(See Deposition Transcript of Amy E. Wolfe, page 37, line 2 –page 38, line 10, annexed

as Exhibit "A" to the Certification of J. DeCarlo.)

       8.    The used condom was stuck in R.M.W.'s airway, preventing him from

passing air into his lungs, which, in turn, caused the child to turn bluish gray, indicating

that the condom was completely obstructing his airway, depriving him of oxygen.

> Q.     What was the first sign to you that something was wrong?
> A.     The gag.  It's the type of gag, as a mother, you know you're not going to hear again because it's that gag.  It's the gag that there's no air getting through.
> Q.     You said A.E.W. had screamed to you something to the effect of R.M.W. is turning blue, R.M.W. is choking.
> A.     He's got something in his mouth.
> Q.     Do you remember when that was in relation to when you heard the gagging.
> A.     It was immediate.

(See Deposition Transcript of Amy Wolfe, p. 39, lines 9-21 annexed as Exhibit "A" to

the Certification of J. DeCarlo.)

       9.    It is unknown for how long a period of time R.M.W. was deprived of

oxygen.

> Q.     Did he gag at any other point in time when you were retrieving the item from his mouth?
> A.     Not until after I got the item from his mouth.

Q.     Was he crying at all during that time?
A.     After.
Q.     Not during?
A.     Not during.  There was no air.  There was no air moving at all.
Q.     Do you know how long of a period of time he had no air entering him?
A.     I don't know how long it took me to get it out at all.  I, I think that I'd like to think that it was really fast that I was able to assess the situation and get it out, but I don't know.

(See Deposition Transcript of Amy Wolfe, p. 45, line 23 – p. 46, line 12 annexed as

Exhibit "A" to the Certification of J. DeCarlo.)

10.    Fearing for her toddler's life, who was motionless, silent and turning a shade

of blue and gray, Mrs. Wolfe immediately undertook emergent action in a desperate

attempt to clear her son's airway through the forceful manipulation of his jaw and throat,

desperately trying to locate the obstruction.  After some time, she retrieved a used

condom that was lodged in his airway.

Q.     …I believe you said you had to reach your fingers into R.M.W.'s mouth?
A.     Right.
Q.     What did you pull out?
A.     I pulled out a used condom.
Q.     Did you retrieve the condom solely by reaching into his mouth and pulling it out or did you have to do any other type of Heimlich or retrieval method?
A.     I didn't use the Heimlich, but there was a lot of maneuvering him around to get a better angle and maneuvering myself around as well.  There was only room for two fingers and it's not as easy as just what's in there.  There's different angles, especially when his mouth was locked down.  But I think I could have moved a car at that point.  I don't think it would have even mattered.

(See Deposition Transcript of Amy E. Wolfe, page 46, line 19, to page 47,line 10

annexed as Exhibit "A" to the Certification of J. DeCarlo.)

11.    Moments after witnessing her son's near fatal choking incident, Mrs. Wolfe

was then faced with the horrific realization that in addition to almost dying, her twenty-

two month old son had just been exposed to a stranger's bodily fluids and bloodborne

pathogens through his ingestion of the contents of a used condom.

> A.   You're talking about I saw the condom as I was taking it to the
> trash. I didn't stop to analyze what it was. I didn't say, oh I see
> this, I see that. I saw what I saw was a used condom. I saw my
> son's situation. I didn't think to even – I didn't think to save the
> condom. I didn't think to.

(See Deposition Transcript of Amy Wolfe, p. 57, lines 16-21 annexed as Exhibit "A" to

the Certification of J. DeCarlo.)

> Q.   Do you know whether or not that condom you found had actually
> been used for any type of sexual activity?
> A.   Do you know what a closed condom and a used condom looks
> like? A closed condom is all rolled up in a little packet and a used
> condom is actually extended and looks used. This one looked
> used. That's what I pulled from my son's mouth. My 22-month
> old son.

(See Deposition Transcript of Amy Wolfe, p. 59, lines 6-14 annexed as Exhibit "A" to

the Certification of J. DeCarlo.)

> 12.   Panicked for her son's life, alone in a hotel room in an unfamiliar location,

and desperate for help and guidance, Mrs. Wolfe frantically attempted to get help from

the hotel staff:

> A.   Went to pick up the phone, there was no dial tone. Ran to the
> bedroom area, there was a phone in there, no dial tone on that
> phone. I had to go into my big huge purse and when you're
> traveling with a family of five the mom has all the stuff. My purse
> was this big and I was looking for a phone that was smaller than
> that. I find the phone, I have to call for help. I called the front
> desk because I see on the table area in the kitchen on the phone
> where to call the front desk directly. I called the front desk and I
> just remember screaming, "There's a problem in room 142. Please
> send help to room 142." I had to call my husband, forget the
> breakfast, just come back to the room. I need help. I can't figure
> out if I'm supposed to call 9-1-1. I don't know if I'm supposed to
> go to the emergency room. I called Berkshire Pediatrics to figure
> out what I'm supposed to do. Berkshire Pediatrics didn't know so
> they had to call Bay State Hospital in Springfield, Massachusetts.

(See Deposition Transcript of Amy Wolfe, p. 38, line 11 – p. 39, line 5 annexed as

Exhibit "A" to the Certification of J. DeCarlo.)

      13.   Mrs. Wolfe also immediately contacted Berkshire Pediatrics, R.M.W.'s

pediatrician, to obtain immediate advice on whether or not she should take her son for

emergent medical treatment because he was deprived of oxygen while he almost choked

to death, and he had also just ingested bodily fluids and bloodborne pathogens contained

within a stranger's used condom:

> Q.    Did you ever call 9-1-1?
> A.    No. I called Berkshire Pediatrics first.
> Q.    Why didn't you call 9-1-1?
> A.    I called for help from the hotel, explained to them what had
> happened. I guess I kind of assumed that they were going to call
> for help for me. I said, "There's an emergency in room 142, please
> send help to room 142." I said, please send help to room 142 over
> and over again. I remember repeating room 142, there's a problem
> in room 142 over and over again.

(See Deposition Transcript of Amy Wolfe, p. 50, lines 9-18 annexed as Exhibit "A" to

the Certification of J. DeCarlo.)

> Q.    What was discussed during that conversation?
> A.    With the pediatrician?
> Q.    I understand you told him what happened but what else was
> discussed? Was there any recommendation of seeking emergency
> treatment?
> A.    We asked if we needed to take him to the emergency room and
> they had to talk to Dr. Shalan, who was doctor on call, and Dr.
> Shalan called me back [ ] and said that he spoke with Bay State
> Pediatric Hospital Infectious Disease Department and that Bay
> State said we could go home and that we had to bring him back in
> two weeks for the first round of STD testing. So long as he was
> moving air that we were safe to go home. Watch him for the night,
> make sure that we were able to wake him up.
> Q.    And is that the plan you chose?
> A.    At that point I trusted the pediatrician more than I trusted anyone
> else in the room. Because I didn't know what the next move
> should be.
> Q.    Did you ever contemplate going to an emergency room?
> A.    Absolutely.

Q.     And did you contemplate that before speaking to the pediatricians.
A.     Yes.
Q.     Did the pediatricians tell you not to go the emergency room?
A.     No. The pediatrician told us we didn't need to go the emergency
       room if he was moving air.

(See Deposition Transcript of Amy Wolfe, p. 51, line 13 – p. 52, line 20 annexed

as Exhibit "A" to the Certification of J. DeCarlo.)

Q.     Were you worried about the amount of oxygen he may have lost
       during that time?
A.     Yes.
Q.     Did you think that it would be important to go to the emergency
       room just on that issue alone?
A.     Yes.
Q.     And the doctors told you not to worry about that?
A.     The doctor said as long as he's moving air he doesn't need to go to
       the emergency room.

(See Deposition Transcript of Amy Wolfe, p. 53, line 18 – p. 54, line 3 annexed as

Exhibit "A" to the Certification of J. DeCarlo.)

     14.   The Wolfe family was well-known to Berkshire Pediatrics as Mrs. Wolfe's

daughter, A.E.W., suffered from a serious congenital heart condition since birth,

requiring her to undergo three open heart surgeries and constant monitoring (which

included the use of a pulse oximeter by Mrs. Wolfe).  In fact, A.E.W., had suffered a

cardiac event while in Florida, which resulted in the Wolfe's having to seek emergency

care in a Florida hospital.  (See Deposition Transcript of Amy Wolfe, p. 56, lines 13-21;

p. 44, lines 8-13 annexed as Exhibit "A" to the Certification of J. DeCarlo.)

Q.     And did you tell his doctors that he was bluish gray and not
       breathing.
A.     Yes.  Given what my daughter has and they've seen us through
       that entire situation, we have medical equipment, we travel with a
       pulse oximeter we know the warning signs.  We know what to look
       for and Berkshire Pediatrics trusts us to know how much we can
       handle before we go to the ER.  But obviously, with a situation like
       this I needed to ask them what to do.
Q.     Okay.

8

| | |
|---|---|
| A. | I think if it would have been any other parent I think they probably would have had that person go to the ER just to be on the safe side. |
| Q. | But they trusted you because of your experience with your daughter? |
| A. | Right. |

(See Deposition Transcript of Amy Wolfe, p.130, lines 2-17 annexed as Exhibit "A" to the Certification of J. DeCarlo.)

15.   R.M.W.'s pediatrician contacted Bay State Infectious Disease on R.M.W.'s behalf and was advised that it was too soon after R.M.W.'s exposure to the bodily fluids and bloodborne pathogens for the toddler to undergo testing.  Mr. and Mrs. Wolfe were advised to follow up in two weeks for a mouth swab to test for sexually transmitted diseases such as gonorrhea and chlamydia.  (See Deposition Transcript of Amy Wolfe, p. 76, lines 15-25; p. 77, lines 1-25 annexed as Exhibit "A" to the Certification of J. DeCarlo.)  (See Medical Records from Berkshire Pediatrics, annexed as Exhibit "B" to the Certification of J. DeCarlo.)

16.   Over the next six months, R.M.W. was also forced to submit to an extensive protocol of blood work at Bay State Hospital for Infectious Disease to ascertain whether or not he had contracted any Hepatitis, HIV, AIDS, and other life threatening, potentially fatal sexually transmitted diseases.

| | |
|---|---|
| Q. | And each time R.M.W. had blood drawn? |
| A. | Yes. |
| Q. | Do you remember how much blood? Do you have any idea? |
| A. | It was actually torturous for him.  A two-year old does not sit still for blood draws.  They needed several vials, and by several, I mean four, five vials.  They had to tie the tourniquet so many different times, both arms.  It ended up being six or eight pricks each time we would go.  Sometimes more because they would do both arms. He's not a, you know, he's a very good-natured baby but he doesn't understand, calm down, this will be very fast.  And they had me holding him in my lap so he is facing outward and then they pulled the arm down and he doesn't, he didn't understand why I couldn't flip him around and hug him. |

(See Deposition Transcript of Amy Wolfe, p. 81, lines 8-25)  (See Medical Records from Bay State Hospital for Infectious Disease, annexed as Exhibit "C" to the Certification of J. DeCarlo.)

17.    During these critical months, Mr. and Mrs. Wolfe closely monitored R.M.W. for any potential symptoms of such diseases.  Any time R.M.W. had a cough, fever or rash, Mrs. Wolfe immediately contacted the pediatrician fearing that he in fact had been exposed to some type of disease.  (See Deposition Transcript of Amy Wolfe, p. 78, lines 2-6; p. 109, line 17 – p. 110, line 7 annexed as Exhibit "A" to the Certification of J. DeCarlo.)

18.    Prior to this occurrence, R.M.W. was a healthy, well-adjusted 22 month-old toddler who was beginning to formulate sentences and was able to express his needs. After the subject incident, R.M.W. stopped talking completely, became extremely anxious and easily overwhelmed.  Mrs. Wolfe testified that R.M.W. just "shut down" after the incident:

> Q.    Are there any other conditions or illnesses that R.M.W. is treating
>         for as a result of this incident?
> A.    After the incident he pretty much stopped talking.  It went back to
>         baby babble that was along the lines of a nine-month old.  The
>         things that we were hearing prior to the incident were things like,
>         "There you are. Here it is."  We didn't hear anything. No Ma Ma,
>         no Da Da.  So about six months in my parents had come to visit
>         and noticed that he wasn't talking anymore and he as talking when
>         we were visiting them in Florida prior to the incident.

(See Deposition Transcript of Amy Wolfe, p. 82, line 15 – p. 83, line 2; p. 83, lines 7-22 annexed as Exhibit "A" to the Certification of J. DeCarlo.)

19.    Mrs. Wolfe was advised to contact the Pediatric Development Center to have R.M.W. evaluated.  In July of 2010, R.M.W. began receiving speech therapy three

times each week for approximately one hour each session.  (See Deposition Transcript of

Amy Wolfe p. 86, lines 8-20 annexed as Exhibit "A" to the Certification of J. DeCarlo.)

      20.   R.M.W.'s psychotherapist opines that the trauma associated with the subject

choking incident and the subsequent testing protocol have caused R.M.W. to become

developmentally delayed, resulting in the need for this three-year old child to enroll in *a*

*special needs preschool program* and *private psychotherapy sessions*.

> R.M.W. was referred to Pediatric Development Center in 8/09 by his
> mother due to concerns about his language, since *he lost language skills*
> *following the choking incident* ( ). He has become extremely anxious
> about visits to the doctor or hospital which needed to occur on a regular
> basis after the incident. *He also tended to become too easily*
> *overwhelmed emotionally or in response to sensory input. He often shut*
> *down by holding his ears, hiding his eyes, and avoiding interactions or,*
> *alternatively, he would seek out extra sensory input by crashing,*
> *jumping, or other deep pressure activities. His feeding skills were poor.*
> *He experienced difficulty using utensils as well as difficulty tolerating*
> *different food textures and types. The trauma involved with what he put*
> *in his mouth and choked on could have impacted on these skills.*
> *R.M.W.'s language skills regressed. He had two-word sentences and*
> *was able to communicate his needs before the incident.* At R.M.W.'s
> initial evaluation with our agency, *his language skills were tested to be at*
> *the 17 and 19 month levels when he was 29 months old.* R.M.W. was
> followed by the Pediatric Development Center's Psychotherapist, Speech
> Pathologist, and Occupational Therapist to address these concerns.  His
> family conscientiously and with great care followed through on
> appointments and any suggestions made.  R.M.W. made gains, but has
> many continued needs. *His ability to calmly and happily play, learn and*
> *interact in his environment in a productive manner has been quite*
> *inconsistent.* He recently turned three so he is no longer eligible for early
> intervention services, so he has begun to attend a special needs preschool
> program.  His family is also pursuing private psychotherapy for R.M.W.
> *In summary, this choking incident was extremely traumatic for R.M.W.*
> *and his family. R.M.W.'s skills regressed and he became too easily*
> *overwhelmed by his environment. With the therapeutic interventions and*
> *much support from the family, R.M.W. has made some gains, but he*
> *continues to present with many needs and concerns.*

(See Report of Diane H. Farella, CEIS, MA/Psychotherapist, annexed as Exhibit "D" to

the Certification of J. DeCarlo.)

21.   In addition to the injuries sustained by R.M.W. (the full extent to which remains unknown), since this incident, Mrs. Wolfe's life has been irreversibly altered. Prior to this incident, Plaintiff, Amy Wolfe, was extremely active in her children's schools and in community activities and organizations, such as Junior League and the Massachusetts Commission on the Status of Women. The task of caring and advocating for her daughter, A.E.W., who was diagnosed *in utero* with a primary diagnosis of Tetralogy of Fallot and several secondary congenital cardiac diagnoses, necessitated frequent planned and unplanned trips to Boston Children's Hospital, about two and a half hours away from Pittsfield. Due to her daughter's illness, Mrs. Wolfe became a Wish Family Ambassador with the Make a Wish Foundation volunteering her time and speaking at functions. She worked closely with the American Heart Association helping pass legislation for automatic external defibrillators in public schools. As a part of this foundation, Mrs. Wolfe and A.E.W. frequently traveled to support the foundation. She has withdrawn from her volunteer organizations. She cannot sleep or think clearly and her mind continuously replays the traumatic vision of her twenty-two month old son lying lifeless and blue, unable to breathe, and her frantic and desperate attempts to free his airway in full view of her two young children, and her shock and horror when she discovered her baby son had ingested the contents of a used condom.

> A.   ... Basically, since the incident I relive the situation over and over again, all day long. Especially when its quiet I'll think about what happened. Or I'll think about hat I could have done differently or what I wish I would have done. But basically, all day long it's the nonstop DVD of what happened, start to finish.
>
> Q.   What do you mean by what I would have done differently?
>
> A.   I wish I would have never stayed at that hotel. I wish we would have kept driving. We only had three and a half hours to get home. We stayed at this hotel because it was rated high for families,

> supposedly ... It was obviously the end of a very long trip. I wish
> we would have just pushed to get home.

(See Deposition Transcript of Amy E. Wolfe, page 92, line 18 to page 93, line 12 –

annexed as Exhibit "A" to the Certification of J. DeCarlo.)

    22.   Immediately after the incident, Ellen Weiden, LICSW diagnosed Ms. Wolfe

with chronic post-traumatic stress disorder, major depressive disorder and insomnia.

> Amy Wolfe states unequivocally that she has not been the same since that
> incident. ***She is filled with doubt about herself and guilt*** that she had not
> adequately checked the room for hazards. ... She continuously replays the
> time there, feeling guilt that she left R.M.W. while she attended A.S.W.
> ***She feels that she didn't do whatever needed to be done to protect***
> ***R.M.W.'s health and experiences a host of other doubts and a large***
> ***burden of guilt and fear which has essentially grounded her and her***
> ***family in ways that have damaged her sense of identity and the family's***
> ***life.*** None of the guilt she experiences is any way reasonable and appears
> symptomatic of the PTSD. She withdrew from Junior League convention
> as that would have meant a hotel stay. She cancelled a scheduled trip to
> Washington with A.E.W. to testify before the U.S. Senate about placing
> automatic external defibrillators in public schools because a hotel stay
> would have been required. The family is not taking a summer vacation
> because Amy Wolfe cannot allow herself or her family to take a chance on
> any hotel or lodging away from home. ***Amy Wolfe continues to mentally***
> ***relive the event at Homewood Suites, experiencing recurrent and***
> ***intrusive memories of it.*** Given that R.M.W. has required follow-up care
> at a large medical center about an hour's distance from the family home,
> in addition to follow up testing and care at the local hospital and
> pediatricians, it is difficult not to be constantly reminded of the actual
> event and the frightening potential sequelae. ***Amy Wolfe has primary and***
> ***secondary insomnia. Amy Wolfe has been diagnosed with ...***
> ***Posttraumatic Stress Disorder, Chronic (as the symptoms have persisted***
> ***for longer than three months) ( ); Major Depressive Order because of***
> ***her current low self-esteem, insomnia, feelings of hopelessness and***
> ***withdrawal from normal and pleasurable activities.***

(See Report of Ellen Weiden, LICSW, annexed as Exhibit "E" to the Certification of J.

DeCarlo.)

    23.   Mrs. Wolfe is currently under the care of a psychiatrist, Dr. Leslie Fishbein,

for treatment of her post traumatic stress disorder, insomnia, and major depression. ***Dr.***

*Fishbein is of the opinion that Plaintiff's Post Traumatic Stress Disorder is directly caused by witnessing her R.M.W.'s near fatal choking incident*, and, that her symptoms of Post Traumatic Stress Disorder and Major Depressive Disorder still persist to date.

> Amy Wolfe was evaluated by me for depression on 6/8/09.  History and examination on that date supported the diagnosis of *Post Traumatic Stress Disorder (PTSD), directly caused by her witnessing her 22 month old son's near fatal choking on a used condom in a New Jersey hotel room*. She was also diagnosed with *Major Depression (MDD)*, Single Episode. Her depression developed in tandem with PTSD, as she found her functioning severely curtailed by *flashbacks of the incident, insomnia and frequent crying*.  She has continued in psychotherapy for PTSD with Brenda Bahnson, MSW, LICSW.  Symptoms of both MDD and PTSD persist to date.

(See Report of Dr. Fishbein, annexed as Exhibit "F" to the Certification of J. DeCarlo.)

     24.    As a result of witnessing her twenty-two month old son's near fatal choking incident, and the subsequent discovery that he was choking on a used condom which, in turn, placed him at an increased risk of contracting a potential deadly disease that no child of his tender years should be at risk for, Amy Wolfe's life has been permanently altered and she is not the woman she was before.

> A.    I can't, I feel like every time I go and try to do any of the things that I was doing, was able to do prior to January 3rd, I'm a mess.  I cry at completely unpredictable moments.  Certain colors look like R.M.W.  Any time somebody mentions there's a hotel or there's a commercial of a hotel or I have to drive by a hotel or the word vacation I think about what we went through.  And its debilitating. All I want to do is cry or I try to hide it.  My daughter is so receptive to everything right now because she's going to be 11. Everything's changed.  I really wish you could have known me prior to January 3rd.

(See Deposition Transcript of Amy E. Wolfe, page 113, line 22, to page 114, line 9 – annexed as Exhibit "A" to the Certification of J. DeCarlo.)

## LEGAL ARGUMENT

## POINT I.

**AMY WOLFE'S CONTEMPORANEOUS OBSERVATION
OF R.M.W.'S NEAR FATAL CHOKING, AND HER
CONTEMPORANEOUS HORRIFIC REALIZATION THAT
R.M.W. HAD BEEN CHOKING ON A USED CONDOM
WHICH CONTAINED BODILY FLUIDS AND BLOODBORNE
PATHOGENS, WHICH COULD, SEPARATE AND ASIDE FROM
THE NEAR FATAL CHOKING, CAUSE HER BABY SERIOUS
BODILY INJURY OR DEATH SATISFIES ALL FOUR
PRONGS OF _PORTEE V. JAFFEE_.**

Summary judgment is a proper remedy only when there is no genuine issue of

material fact challenged, and the moving party is entitled to judgment as a matter of law.

On a motion for summary judgment, the moving party has the burden of showing that no

genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and

their reasonable inferences in the light most favorable to the non-moving party. See

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d. Cir.1995).

The tort of negligent infliction of emotional distress developed in New Jersey in

much the same manner as it developed elsewhere. See W. Page Keeton, et al., Prosser

and Keeton on the Law of Torts § 54, at 361-62 (W. Page Keeton ed., 5th ed.1984)

(discussing development of tort claim for emotional injury absent physical impact in

various states). Foreseeability was initially, and has remained, the touchstone for liability

for negligently causing emotional injury to another. In its earliest stages, a plaintiff could

recover for emotional anguish arising from a defendant's negligent conduct only when

some physical impact on the plaintiff accompanied the emotional harm. See Ward v. W.

Jersey & Seashore R.R. Co., 65 N.J.L. 383384 (Sup.Ct.1900). Although the physical

impact requirement remained part of New Jersey's emotional distress common law well

into the twentieth century, the physical impact requirement proved to be more of an inconvenient formality than a significant threshold for recovery.[1]  See Portee v. Jaffee, 84 N.J. 88, 94 n.4 (1980) (characterizing physical impact requirement as "mere formality"). In 1965, the physical impact requirement was jettisoned explicitly by the New Jersey Supreme Court in Falzone v. Busch, 45 N.J. 559, 569 (1965) when the Court held that a plaintiff could recover for an emotional injury, even if unaccompanied by a physical impact, provided that the defendant's conduct placed the plaintiff in "a reasonable fear of immediate personal injury," which in turn, caused the plaintiff to suffer substantial bodily injury or sickness.  Thus, after Falzone, courts in New Jersey considered emotional distress that accrued to any plaintiff who was within the "zone of risk" created by the negligent conduct, so long as substantial bodily injury or sickness also resulted from the fright.  See, e.g., Caputzal v. Lindsay Co., 48 N.J. 69, 76 (1966).

The final evolution of the tort of negligent infliction of emotional distress in New Jersey occurred in Portee v. Jaffee, 84 N.J. 88 (1980).  In Portee, a seven-year old boy was trapped in an elevator shaft, when the elevator proceeded to ascend, dragging the boy along with it.  The boy's mother watched as her son moaned, cried out, and flailed his arms.  The mother filed a wrongful death action against the owner of the building and the elevator company, as well as an action on her own behalf for her mental and emotional distress caused by observing her son's anguish.  In considering whether to extend liability to a bystander in no potential danger but who observes a close family member suffering, the Portee Court clarified and expanded the doctrine it had established in Falzone, noting

---

[1] For example, in Porter v. Delaware, Lackawanna & Western Railroad Co., 73 N.J.L. 405, (Sup.Ct.1906), the physical impact requirement was deemed satisfied despite the absence of any significant physical injury to the plaintiff where the plaintiff claimed that a piece of debris from a railway bridge that collapsed grazed her neck and that dust entered her eyes.  Id. at 406.

that <u>Falzone</u> did not expressly limit liability to those cases in which the distressed plaintiff had been subjected to an unreasonable risk of physical harm, and held that a plaintiff could maintain an independent cause of action for negligent emotional distress where (1) the defendant's negligence caused the death of, or serious physical injury to another; (2) the plaintiff shared a marital or intimate familiar relationship with the injured person; (3) the plaintiff had a sensory and contemporaneous observation of the death or injury at the scene of the accident; and (4) the plaintiff suffered severe emotional distress. <u>Portee</u>, <u>supra</u>, 84 N.J. 97.

A critical element in the spectrum of <u>Portee</u> cases is the intimate family relationship between the plaintiff and the immediate victim.  It is this relationship that serves as the factual and legal basis for determining whether a duty of reasonable care is owed to the plaintiff.  Thus, the fairness in imposing such a duty, the legitimacy of such a claim brought by a family member, and the genuineness of the ensuing emotional distress, all spring from and depend upon the strength of the family ties between the plaintiff and the victim.  <u>Giardina v. Bennett</u>, 111 N.J. 412 (1988) (permitting the parents to sustain a <u>Portee</u> claim for emotional distress against physician causing the pre-birth death of their unborn infant).  In permitting the mother to recover for her mental and emotional distress, the <u>Portee</u> Court astutely observed:

> In the present case, the interest assertedly injured is more than a general interest in emotional tranquility. *It is the profound and abiding sentiment of parental love.  The knowledge that loved ones are safe and whole is the deepest wellspring of emotional welfare.*  Against that reassuring background, the flashes of anxiety and disappointment that mar our lives take on softer hues. *No loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure.*  The law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed.

Portee v. Jaffee, 84 N.J. 88, 97 (1980) (emphasis added).

> Our analysis of the specific emotional interest injured in this case of
> fundamental interest in emotional tranquility founded on parental love
> reveals where the limits of liability would lie.  Addressing the Dillon
> criteria in reverse order, we find the last *the existence of a close*
> *relationship to be the most crucial.  It is the presence of deep, intimate,*
> *familial ties between the plaintiff and the physically injured person that*
> *makes the harm to emotional tranquility so serious and compelling.  The*
> *genuine suffering that flows from such harm stands in stark contrast to*
> *the set backs and sorrows of everyday life.*

The four-element test for negligent infliction of emotional distress announced in

Portee has since become a mainstay of New Jersey tort law.  Jablonowska v. Suther,

supra, 195 N.J. at 104.  Moreover, the common law in New Jersey has widened the net of

circumstances in which an emotional injury sustained by a bystander is deemed a

foreseeable consequence of negligent conduct, and the breath of that liability has evolved.

Jablonowska v. Suther, 195 N.J. 91, 101 (2008).  In 1994, the Supreme Court extended

the relationship prong of Portee by holding that the "familial relationship" between the

bystander and the injured person which permits recovery is not necessarily limited to

relationships of marriage or blood.  See Dunphy v. Gregor, 136 N.J. 99 (1994).  In

affording an unmarried cohabitant the protections of bystander liability for the negligent

infliction of emotional injury, *the Supreme Court specifically recognized that in*

*numerous settings, traditional principles of tort liability can be adapted to address*

*areas in which recognition of a cause of action and the imposition of a duty of care are*

*both novel and controversial.  Dunphy v. Gregor, 136 N.J. at 109.*

The most recent issue related to a Portee claim in New Jersey was whether the

verbal threshold provision in the Automobile Insurance Cost Reduction Act of 1998

(AICRA), N.J.S.A. 39:6A-1.1 to 35, which acts as a limitation on an insured's ability to

sue a negligence operator of a motor vehicle, can apply to bar an insured from

maintaining a claim for negligent infliction of emotional distress under Portee v. Jaffee.[2]

This question was answered last year by the New Jersey Supreme Court in Jablonowska

v. Suther, 195 N.J. 91 (2008).  In holding that the unique, derivative Portee claim is

independent of AICRA'a verbal threshold, the Supreme Court reasoned as follows:

> It is far from clear from the face of the verbal-threshold statute that the
> Legislature intended to subject Portee claims, as a class, to the threshold's
> bodily injury requirement.  In analyzing the verbal threshold's intended
> applicability in these circumstances, it is compelling that the requirements
> for stating a *prima facie* Portee claim are specially tailored to address the
> particular form of emotional harm that it seeks to redress.  Unlike
> emotional distress tied to the possibility of personal harm to the plaintiff, a
> Portee claim is not dependent on the aggrieved person's presence within
> the zone of danger created by the defendant's negligent conduct.
> *Compare* Portee, *supra,* 84 *N.J.* at 97-98, 101, 417 *A.2d* 521 *(requiring*
> *only that plaintiff have sensory, contemporaneous perception of serious*
> *injury to spouse or intimate family member), with Falzone, supra,* 45 *N.J.*
> at 569, 214 *A.2d* 12 (insisting on plaintiff's presence within zone of danger
> created by defendant's negligent conduct).

Jablonowska, supra, 195 N.J. at 106-107.  In so holding, the Jablonowska Court took

specific note of the fact that a Portee claim focuses on a "unique type of heartsickness"

which "allows compensation for the severe emotional distress resulting from *perceiving*

the death of, *or severe injury* to, a spouse or close familial relation."

> A Portee claim under our common law has always transcended the need to
> prove permanent physical injury because it focuses on a unique type of
> heartsickness.  It allows compensation for the severe emotional distress
> resulting from *perceiving* the death of, or severe injury to, a spouse or
> close familial relation.  Absent some express legislative indication to the
> contrary, it is illogical to presume that the Legislature impliedly meant to
> subject Portee claims to the verbal threshold's permanent-injury
> requirement that the tort itself foregoes.  Indeed, to accept the lower
> court's reasoning that the verbal threshold applies to Jablonowska's tort
> claim would result in the prohibition of any Portee claim arising out of the
> use of a motor vehicle, absent proof that the plaintiff sustained some
> permanent, physical bodily injury when such injury is not a necessary
> proof element at common law.  We find no more than an arguable abstract
> ambiguity that the Legislature ever intended to make AICRA's revised

---

[2] Portee v. Jaffee, 84 N.J. 88 (1980).

> verbal threshold applicable to <u>Portee</u> claims when such claims had not
> been subjected to the threshold before.  Accordingly, we hold that <u>Portee</u>
> claims are independent of the verbal threshold's requirements.

<u>Jablonowska</u>, <u>supra</u>, 195 N.J. at 110.

In a <u>Portee</u> claim, it is the plaintiff's "perception" which causes the perceiver to "suffer a traumatic sense of loss."  Such emotional distress is inflicted by the trauma of seeing a loved one suffer a ***near fatal*** or fatal injury.  <u>See</u> <u>Wolfe v. State Farm Ins.</u> <u>Company</u>, 224 N.J. Super. 348 (App. Div. 1988).  The viability of a <u>Portee</u> claim depends only on whether the plaintiff has had a sensory, contemporaneous perception of a near fatal, serious or fatal injury that was sustained by a spouse or close family member, irrespective of the distance from which that perception arises.  <u>Id.</u> at 107.  Recovery for the negligent infliction of emotional distress ***is meant to cover the observation of shocking events that do not occur in the daily lives of most people.***  <u>Frame v. Kothari</u>, 115 N.J. 638, 644 (1989) (citing to Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: The Bystander Recovery" Cases*, 54 S.Cal.L.Rev. 847, 871 (1981)).

In the following cases, which specifically address the seriousness of the injury sustained by the primary victim in a bystander case, the courts held that the primary victim's injuries were sufficiently serious to enable a bystander to state a claim for negligent infliction of emotional distress.  In <u>Barnhill v. Davis</u>, 300 N.W.2d 104 (Iowa 1981), a motorist who witnessed his mother's involvement in an automobile collision that caused her to suffer a bruised rib cage and mild muscle strain had met Iowa's requirement that the bystander's apprehension of serious injury to the primary victim be reasonable.  The plaintiff watched as his mother's car was struck on the driver's side by a car driven by one defendant and owned by the other.  His mother was examined by doctors shortly after the accident and also approximately six weeks later.  The first examination disclosed a

bruised rib cage and mild muscle strain. The second examination report stated that she did not claim a continuing physical injury from the accident. The trial court granted the defendant's motion for summary judgment on the grounds that a bystander cannot recover as a matter of law for emotional distress due to harm to a third person caused by a defendant's negligence. On appeal the Iowa Supreme Court established five factors to be considered in determining whether a bystander's claim for emotional distress is actionable. One of the factors is whether a reasonable person in the position of the bystander would believe, and the bystander did believe, that the primary victim of the accident would be seriously injured or killed. Concluding that the plaintiff had, at minimum, generated a genuine issue of material fact with regard to this factor, the court reversed the summary judgment and remanded for further proceedings.

In Haselhorst v. State, 485 N.W.2d 180 (1992), the plaintiffs were licensed by the state as foster parents. It was discovered that the foster child, age 15, had sexually abused each of the plaintiffs' children, ages eight, seven, five, and four, throughout the nearly 11 months of his placement in the plaintiffs' home. The state argued that the children had not been seriously injured (despite the fact that a psychotherapist testified that all of the plaintiffs' children were suffering from post-traumatic stress disorder, and that extensive psychotherapy would be necessary to help resolve their condition.) Affirming a judgment for the plaintiffs on their negligence claim against the state, the appellate court held that because it was undisputed that the children were sexually abused, and that because of that abuse they had been permanently scarred in a psychological sense, the parent-bystanders could state a claim for negligent infliction of emotional distress.

In the present matter, Mrs. Wolfe witnessed the near fatal choking of her 22-month old son (the injury). Mrs. Wolfe then immediately came to the realization that the near fatal choking of her 22-month old son was initiated by the fact that he had ingested a used condom and all of the bodily fluids and bloodborne pathogens that were contained therein/thereon. Clearly, this is not the type of shocking event that occurs in the daily lives of most people. The anguish suffered by Mrs. Wolfe with respect to her son is twofold. First, she experienced (contemporaneous to the incident) the initial shock, anguish and fright when she heard her son gag, and observed her son to be unresponsive, not breathing and blue and color. She then frantically took emergent action to free his airway so that he could begin to again move air through his lungs (and begin breathing) only to discover, with shock, horror and fright (also contemporaneous to the incident) that her baby son had ingested a stranger's bodily fluids and bloodborne pathogens through his ingestion of a used condom, which could, separate and aside from the near fatal choking, cause her baby serious personal injury or death. It is respectfully submitted that the common law of this state has evolved to a point where this Court must recognize a valid cause of action for the emotional distress suffered by Mrs. Wolfe under the facts of this case, where her contemporaneous observation of the near fatal choking and the ingestion of bodily fluids and bloodborne pathogens, satisfy the serious injury prong contemplated by the Supreme Court in Portee.

The third prong of Portee requires contemporaneous observation. Under this prong, the plaintiff must observe the death or serious bodily injury of a loved one at the scene of the incident. Portee at 101. In Frame v. Kothari, 115 N.J. 638 (1989), the Court succinctly delineated the prerequisites of this prong:

22

> Recovery for emotional distress is meant to cover the observation of
> shocking events that do not occur in the daily lives of most people.
> Merely being on the scene may not be enough.  The injury must be one
> that is susceptible to immediate sensory perception, and the plaintiff must
> witness the victim when the injury is inflicted or immediately thereafter.

Frame v. Kothari, 115 N.J. at 43-44 (internal citation omitted).

The requirement that plaintiff must have observed the death or injury at the scene

of the accident is satisfied by showing that the plaintiff was sensorially aware, in some

important way of the injury.  Ortiz v. John D. Pittinger Builder, Inc., 382 N.J. Super. 552,

561 (Law Div. 2004).  The "observation" required by Portee involves sensory perception,

and sight is only one of the senses.  Hearing is also a form of perception that constitutes

an observation.  Mansour v. Leviton Manufacturing Co., 382 N.J. Super. 594 (App. Div.

2006) (holding that auditory "observation" of a traumatic accident meets the third

element of a bystander liability claim).  Given the fact that in addition to hearing her baby

son gag on what she believed could be his last breath, and, that Mrs. Wolfe then was

intricately involved in rendering the emergent first aid which, after some time, cleared

R.M.W's airway, and, ultimately led to the contemporaneous observation of the offensive

condom, it simply cannot be argued that Mrs. Wolfe did not contemporaneous observe

the near fatal/injury in this case.

The cause of action based upon negligent infliction of emotional distress, as

recognized by Portee, represents an accommodation, as a matter of public policy,

between two competing considerations:  avoidance of unfettered imposition of liability

on tortfeasors for the mental anguish suffered by loved ones, and, on the other hand, the

appreciation that that anguish is real, consequential and foreseeable.  The basis of the

accommodation is *the perception that the observation of the occurrence of the*

*negligently inflicted injury results in a wrench to the psyche of the victim's loved ones*

*separate from and dramatically more excruciating than the anguish attendant upon later learning of the event or seeing its consequences.* <u>Polikoff v. Calabro</u>, 209 N.J. Super. 110 (App. Div. 1986).

For all of the foregoing reasons, it is respectfully submitted that Mrs. Wolfe has established a *prima facie* claim for emotional distress under <u>Portee v. Jaffee</u> and, therefore, Defendants' motion must be dismissed.

## POINT II.

**THE DETERMINATION OF WHETHER R.M.W.'S INGESTION OF BODILY FLUIDS AND BLOODBORNE PATHOGENS CONSTITUTES AN INJURY IS FOR THE JURY, AND THUS, MRS. WOLFE'S *PORTEE* CLAIM, WHICH, IN PART, ARISES FROM SAID INJURY, IS NOT SUBJECT TO DISMISSAL ON A MOTION FOR SUMMARY JUDGMENT.**

Defendants maintain that this Court must conclude that R.M.W. did not sustain an "injury" because the infectious disease testing performed on this young child since the subject incident has been negative. In Williamson v. Waldman, 291 N.J. Super. 600 (App. Div. 1996),[3] the Appellate Division expressly stated:

> Where a defendant's negligent act or omission *provides an occasion from which a reasonable apprehension of disease may eventuate*, and where the quality of the conduct is such to create a presumption of exposure, *the resulting claim for damages by reason of emotional injury may not be dismissed on summary judgment.*

Williamson v. Waldman, at 291 N.J. Super. 604 (emphasis added).

The plaintiff in Williamson was pricked with a lancet[4] concealed within rubbish when, functioning as an employee of a cleaning contractor, she attempted to remove EKG stickers from a trash can in the defendant's medical offices. The trial court dismissed her claim for negligent infliction of emotional distress and related claims based upon her fear of an infectious disease on a motion for summary judgment filed by the defendants. The issue presented to the Appellate Division was whether it was correct, in the circumstances presented, to dismiss plaintiff's claim on summary judgment because she failed to make a *prima facie* showing of actual exposure to the diseases she feared, and because, in light of all the testing and negative results, the plaintiff's reaction to

---

[3]Williamson v. Waldman, 291 N.J. Super. 600 (App. Div. 1996) *affirmed and modified* 150 N.J. 232 (1997)
[4]A lancet is commonly referred to as a "short sharp" and is commonly used for pricking a finger to acquire a blood sample.

favorable tests (and her alleged continued distress in the face of same) demonstrated her

to be a person of average constitution. Williamson, at 291 N.J. Super. 603.

In reversing and remanding the case to the trial court, and holding that the

plaintiff was not required to demonstrate actual exposure to an infectious disease, but

could recover based on the reasonableness of her fears, ***which created a jury question,***[5]

the Appellate Division correctly stated:

> It cannot validly be said, as a matter of law, in light of the common
> knowledge, that a person who receives a puncture wound from medical
> waste reacts unreasonably in suffering serious psychic injury from
> contemplating the possibility of developing AIDS, even if only for some
> period of time, until it is no longer reasonable, following a series of
> negative tests, to apprehend that result. Indeed, one need not have actually
> acquired the HIV virus to be so affected by such a fear for a period,
> especially since some time must pass before an accurate test can be
> administered. We know of no reason, given the existing circumstances
> and the realities of the times, as well as the policies that underlie tort law
> doctrine in this state, to require as a prerequisite to recovery for infliction
> of emotional distress that the plaintiff first establish actual exposure to the
> feared disease.    ....

Williamson, at 291 N.J. Super. at 604.

It is respectfully submitted that any finding by this Court that it is unreasonable

for R.M.W. to have sustained an injury (for any period of time) despite his ingestion of

bodily fluids and bloodborne pathogens would be an unwarranted and inappropriate legal

conclusion under New Jersey case law. The denial of Defendants' motion for summary

judgment will not subject the Defendants to any *per se* rule of negligence. The jury will

be called upon to evaluate whether or not R.M.W.'s ingestion of bodily fluids and

bloodborne pathogens constituted an injury to R.M.W. in accordance with the holding of

Williamson:

---

[5] That portion of the Court's holding requiring the issue to be resolved by a jury and not by a motion for summary judgment was not modified by the Supreme Court. Williamson v. Waldman, 291 N.J. Super. 600 (App. Div. 1996) *affirmed and modified* 150 N.J. 232 (1997).

Plaintiff will be successful only if the jury finds negligence by the defendants, and only to the extent it finds serious or substantial emotional injury from reasonably experienced emotional distress, see Frame v. Kothari, 115 N.J. 638, 642 (1989); Portee v. Jaffee, 84 N.J. 88, 94-95, including such permanent consequences as may be found, from the date of the puncture incident to whatever point, after medical consultation and tests, a reasonable person would cease to be so emotionally affected by the incident as to be visited with such dire consequences.

Williamson, 291 N.J. Super. at 607.

In light of the foregoing, Plaintiffs respectfully submit that Defendants' Motion for Partial Summary Judgment must be denied.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion for Partial Summary Judgment

as to Plaintiffs Amy Wolfe's Portee claim and Steven Wolfe's *per quod* claim should be

denied.

Respectfully submitted,

HOBBIE, CORRIGAN, BERTUCIO & TASHJY, PC
Attorneys for Plaintiffs


By s/ Jacqueline DeCarlo
   JACQUELINE DECARLO, ESQ. (JD-2676)
   **HOBBIE, CORRIGAN, BERTUCIO &**
   **TASHJY, P.C.**
   125 Wyckoff Road
   Eatontown, New Jersey 07724
   (732) 380-1515
   Attorneys for Plaintiffs

Dated:  April 30, 2010