UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| R.M.W., a minor, | : | Hon. Joseph H. Rodriguez |
| by his Guardian Ad Litem, STEVEN F. WOLFE; | | |
| AMY E. WOLFE; STEVEN F. WOLFE, | : | Civil Action No. 09-400 |
| Plaintiffs, | : | ORDER |
| v. | : | |
| HOMEWOOD SUITES BY HILTON MT. LAUREL; | : | |
| HILTON HOTEL CORP.; THE BLACKSTONE GROUP, | | |
| L.P.; H.W. HERITAGE INN OF MT. LAUREL, INC., | : | |
| Defendants. | : | |

This matter is before the Court on two defense motions for partial summary judgment. Oral argument was heard on the motions on December 16, 2010, and the record of that proceeding is incorporated here. For the reasons articulated during oral argument, and those set forth below, one of the motions will be granted, and one will be denied.

## Background

Plaintiffs have complained that on January 3, 2009, R.M.W., 22 months old at the time, choked on and ingested the contents of an allegedly used condom while a guest at the Homewood Suites in Mt. Laurel, New Jersey.

On January 2, 2009, Plaintiffs were driving home to Massachusetts after having spent the holidays with family in Florida. At approximately 9:15 p.m., they checked into suite 142 of the Homewood Suites by Hilton Hotel in Mt. Laurel, along with minor children A.E.W., age 9, and A.S.W., age 4. The room appeared to have been cleaned. Mrs. Wolfe inspected the room for potential hazards, and moved a planter and pots that she deemed unsafe. Mrs. Wolfe then removed the cushions from the closed pull-out

sofa bed, opened the bed, and made the bed using two sheets and a blanket supplied by the hotel in a zipped plastic bag in the closet.

After the family spent the night, on January 3, 2009 at approximately 9 a.m., Plaintiff Steven F. Wolfe left the hotel to purchase coffee and breakfast for his family. Plaintiff Amy E. Wolfe had just changed R.M.W., and she left him on the room's pull-out sofa to attend to A.S.W. in the bathroom. At the time, A.E.W. was playing video games in the same room as R.M.W. Approximately forty seconds after she left him, Amy Wolfe heard her son, R.M.W., choking in the next room. A.E.W. proceeded to scream, "[R.M.W.]'s blue. [R.M.W.]'s got something in his mouth." Amy Wolfe rushed to her child's aid; he was still seated in the same place where she had left him on the sofa bed. She was horrified to discover that R.M.W. had been chewing on, and was choking on, an apparently used condom which evidently had been overlooked by housekeeping.

Mrs. Wolfe described the incident as follows:

> I had to fight with R.M.W. to get whatever it was – I didn't know what it was at the time because, obviously, you can't see that. And he was blue and it was hard to get my hand down his throat. He was 22 months old so I think that their instinct is to bite down hard. I had to have my fingers, two fingers I was able to get in and my index finger caught the lip of something, but whatever it was he was already inhaling it.
> It was a very fast paced situation. And when I was able to finally get it out, because it wasn't easy, my other children were sitting there screaming because I think A.S.W. didn't understand that R.S.W. was choking because all he saw was that his mother was fighting with his baby brother to get something out of his mouth. And A.E.W. saw the whole thing, start to finish. So she didn't know what to do. She was kind of jumping around and my daughter has heart problems so we were really nervous. I was, you know, really nervous about that. But we just sat there after everything had happened and didn't know what to do. Call who? I have no idea.

(Amy Wolfe Dep., p. 37-38.)

After the condom was removed, R.M.W. became pink in color. Amy Wolfe did not perform the Heimlich maneuver or any further efforts at CPR. She notified the hotel staff of the incident[1] and called Steven Wolfe to notify him as well. She also called her pediatrician's office and was advised that it was too soon to begin testing for any diseases. Amy Wolfe immediately disposed of the condom in the trash can under the kitchen sink.

Two weeks after the incident, Mrs. Wolfe took her child to the pediatrician to begin medical testing to ascertain whether R.M.W. had contracted any sexually-transmitted diseases. R.M.W. underwent a mouth swab for gonorrhea and chlamydia, and the results were negative. The Wolfes took R.M.W. to an infectious disease specialist three or four times after the initial test, and had blood tests run for HIV, AIDS, and/or any other life-threatening diseases. The records of the infectious disease specialist indicate that R.M.W. was "asymptomatic," and all tests came back negative; R.M.W. did not contract any infectious diseases as a result of the incident.

R.M.W.'s psychotherapist has opined that the trauma associated with the choking incident and subsequent testing protocol have caused R.M.W. to become developmentally delayed. He receives speech therapy and attends a special needs preschool program and private psychotherapy sessions.

Amy Wolfe has been diagnosed with chronic post-traumatic stress disorder, major depressive disorder, and insomnia. She is under the care of a psychiatrist who is

---

[1]Specifically, Mrs. Wolfe testified that after she retrieved the condom from her son's throat, she attempted to call someone for help, but the hotel room phones had no dial tone. (Amy Wolfe Dep., p. 38.) She found her cell phone and called the front desk, "screaming, 'There's a problem in room 142. Please send help to room 142.'"

of the opinion that Amy Wolfe's post-traumatic stress disorder was directly caused by witnessing R.M.W.'s "near fatal" choking incident. Mrs. Wolfe first saw a doctor for herself approximately a week after the incident.

Presently before the Court are two motions for summary judgment. The first [41] was filed by counsel for Defendants H.W. Heritage Inn of Mt. Laurel, Inc., The Blackstone Group L.P., and Hilton Hotels Corp. in connection with <u>only</u> the punitive damage claims. That motion seeks summary judgment on the Second, Fifth, Seventeenth, Eighteenth, Twenty-First, and Twenty-Second Counts of the First Amended Complaint. The motion asserts that there is no record evidence of any act or omission by any of the Defendants that would rise to the level of "wanton and willful disregard," as required by New Jersey's Punitive Damages Act, N.J. Stat. Ann., § 2A:15-5.9. The second motion [44] has been filed by separate counsel for Defendants H.W. Heritage Inn of Mt. Laurel, Inc., The Blackstone Group L.P., and Hilton Hotels Corp. It seeks summary judgment on the claims asserted by Amy E. Wolfe pursuant to <u>Portee v. Jaffe</u>, 84 N.J. 88 (1980), Counts Sixteen and Seventeen, as well as Steven F. Wolfe's *per quod* claims, Counts Twenty One and Twenty Two which hinge on the claims of Mrs. Wolfe.

## Discussion

### A. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986));

4

accord Fed. R. Civ. P. 56 (a). The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.  New Jersey Punitive Damages Act**

Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice[2] or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. N.J. Stat. Ann. § 2A:15-5.12(a). Willful or wanton conduct is a deliberate act or omission with knowledge or a high degree of probability of harm to another who foreseeably might be harmed by defendant's acts or omissions and

---

[2]Plaintiffs do not contend that Defendants acted with actual malice.

reckless indifference to the consequence of the acts or omissions.  N.J. Stat. Ann. § 2A:15-5.10.

> Something more than the mere commission of a tort is always required for punitive damages.  There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called willful or wanton.  Lacking this element, mere negligence, however 'gross,' is generally not held to be enough [for the imposition of punitive damages].

Intermilo, Inc. v. I.P. Enters., Inc., 19 F.3d 890, 893 (3d Cir. 1994) (quoting Nappe v. Anschelewitcz, Barr, Ansell & Bonello, 477 A.2d 1224, 1231 (N.J. 1984)).  The question of whether a defendant's conduct was wantonly reckless or malicious is ordinarily one for the finder of fact, as long as there is a legal foundation in the record to support a punitive damage award.  Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118, 1135-36 (D.N.J. 1990); Domm v. Jersey Printing Co., 871 F. Supp. 732, 739 (D.N.J. 1994).

Both Mr. and Mrs. Wolfe have testified that they had no factual basis for contending that the Defendants did anything purposefully or intentionally.  (Amy Wolfe Dep., p. 125; Seven Wolfe Dep., p. 39-40.)  Indeed, the Court has reviewed the entire record and has found nothing that would tend to support a characterization of Defendants' conduct as willful or wanton.  Because there is no record evidence of any act or omission by any of the Defendants that would rise to the level of "wanton and willful disregard," as required by New Jersey's Punitive Damages Act, N.J. Stat. Ann., § 2A:15-5.9, Defendants' motion for summary judgment dismissing the claims for punitive damages is granted.

### C. Bystander Liability

In Portee v. Jaffe, 417 A.2d 521 (N.J. 1980), the New Jersey Supreme Court "first recognized a cause of action for the negligent infliction of emotional injury experienced by a bystander who witnessed the wrongful death [or serious physical injury] of another person." Dunphy v. Gregor, 642 A.2d 372, 373 (N.J. 1994). The court reiterated that "no loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of death or serious bodily injury to one of those whose very existence is a precious treasure." Id. at 378. Portee established "a four-factor test for determining a cause of action for negligent infliction of emotional distress." Id. at 374. To prevail on such a claim, the claimant must demonstrate: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between the plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Portee, 417 A.2d at 528.

Plaintiffs have argued that "the common law of this state has evolved to a point where this Court must recognize a valid cause of action for the emotional distress suffered by Mrs. Wolfe under the facts of this case, where her contemporaneous observation of the near fatal choking and the ingestion of bodily fluids and bloodborne pathogens, satisfy the serious injury prong contemplated by the Supreme Court in Portee." The Court agrees that the heart of the issue here is whether there occurred the type of "serious injury" contemplated by Portee. The Court also agrees that the injury Mrs. Wolfe contemporaneously witnessed was sufficiently severe to bring it under the purview of Portee.

New Jersey courts have made clear that Portee allows compensation for "a unique type of heartsickness," the severe emotional distress resulting from perceiving severe injury to a close family member.  Jablonowska v. Suther, 948 A.2d 610, 621-22 (N.J. 2008).  "[I]t is the plaintiff's perception which causes the perceiver to 'suffer a traumatic sense of loss,'" Wolfe v. State Farm Ins. Co., 540 A.2d 871, 873 (N.J. Super. Ct. App. Div. 1988) (quoting Portee, 417 A.2d at 527), "that may destroy [her] sense of security and cause severe emotional distress," Portee, 417 A.2d at 527.  In essence, recovery under Portee "is meant to cover the observation of shocking events that do not occur in the daily lives of most people."  Frame v. Kothari, 560 A.2d 675, 678 (N.J. 1989) (citation omitted).

The development of New Jersey law with respect to claims for negligent infliction of emotional distress has been "incremental."  Picogna v. Board of Educ. of Twp. of Cherry Hill, 671 A.2d 1035, 1038 (N.J. 1996).  The cause of action "involves traditional concepts of duty, breach, and causation," where duty "is analyzed in terms of foreseeability."  Williamson v. Waldman, 696 A.2d 14, 17 (N.J. 1997).  Early on, the Supreme Court of New Jersey stated that "liability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted."  Caputzal v. Lindsay Co., 222 A.2d 513, 517 (N.J. 1966).

> The progression [of the law of negligent infliction of emotional distress] has [then] been from denying recovery unless the emotional distress is accompanied by physical impact, Eyrich v. Dam,, 473 A.2d 539 (App. Div.), cert. denied, 483 *A*.2d 127 (N.J. 1984), to permitting recovery if the emotional distress results in physical injury [even in the absence of physical impact], Falzone v. Busch, 214 A.2d 12 (N.J. 1965).  [The court then] found a sufficient guarantee of genuineness, even in the absence of physical injury, if the plaintiff perceives an injury to another at the scene of the accident, the plaintiff and the victim are members of the same family, and the emotional distress is severe.  Portee v. Jaffee, 417 A.2d 521 (N.J. 1980).

9

Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 862-63 (N.J. 1988).

"[T]he trend of the prior decisions in the area of bystander emotional distress has been to expand liability. It is not, however, the trend, but the social policy underlying it, that should guide the development of the common law." Frame, 560 A.2d at 683 (C.J. Wilentz and J. Garibaldi, concurring). In this vein, the Court turns to Williamson for the guidance it provides as to the cause of action of negligent infliction of emotional distress in New Jersey.

In the Williamson case, the Appellate Division decided that it was inappropriate to grant summary judgment for the defense where a cleaning employee for a medical office suffered a puncture wound from a lancet, and sued for emotional distress damages based on exposure to feared disease. In that case, the employee did not in fact contract any disease from the potential exposure. Nonetheless, the Appellate Division found that,

> where a defendant's negligent act or omission provides an occasion from which a reasonable apprehension of contracting a deadly disease may eventuate, and where the quality of the conduct is such to create a presumption of exposure, the resulting claim for damages by reason of emotional injury may not be dismissed on summary judgment.

Williamson, 677 A.2d at 1181.

The Court is well aware of the distinction that the defense has attempted to make to distance the circumstances of this case from those of Williamson. However, "[t]he characterization of a claim as 'direct' or 'indirect,' although useful for distinguishing claims in which the source of the emotional distress is an injury to the claimant from those in which an injury is to another, should not predetermine the rights of the parties. More important than the characterizations are the principles underlying them." Carey v. Lovett, 622 A.2d 1279, 1286 (N.J. 1993).

Accordingly, this Court is of the opinion that the Portee claims in this particular case, due to the uniqueness of the circumstances, should go to the jury. Summary judgment on those claims therefore are denied.

## Conclusion

For the reasons set forth above, as well as those discussed on the record during oral argument,

IT IS ORDERED this 20th day of December, 2010 that the motion **[41]** filed by counsel for Defendants H.W. Heritage Inn of Mt. Laurel, Inc., The Blackstone Group L.P., and Hilton Hotels Corp. in connection with only the punitive damage claims seeking summary judgment on the Second, Fifth, Seventeenth, Eighteenth, Twenty-First, and Twenty-Second Counts of the First Amended Complaint, insofar as those Counts seek punitive damages, is hereby GRANTED.

IT IS FURTHER ORDERED that the motion **[44]** filed by separate counsel for Defendants H.W. Heritage Inn of Mt. Laurel, Inc., The Blackstone Group L.P., and Hilton Hotels Corp. seeking summary judgment on the claims asserted by Amy E. Wolfe pursuant to Portee v. Jaffe, 84 N.J. 88 (1980), Counts Sixteen and Seventeen, as well as Steven F. Wolfe's *per quod* claims, Counts Twenty One and Twenty Two which hinge on the claims of Mrs. Wolfe, is hereby DENIED.

      /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.